William J. WELSH, Respondent,

v.

BURLINGTON NORTHERN RAILROAD COMPANY, Appellant.

No. 49900.

Missouri Court of Appeals, Eastern District, Division Two.

Aug. 12, 1986.

Motion For Rehearing and/or Transfer to Supreme Court Denied Sept. 24, 1986.

Application to Transfer Denied Dec. 16, 1986.

James W. Newbold, Private Atty., St. Louis, for appellant.

Charles Marshall Friedman, Private Atty., St. Louis, for respondent.

DOWD, Presiding Judge.

Burlington Northern Railroad Company (hereinafter defendant) appeals from a judgment entered on a jury verdict for William J. Welsh (hereinafter plaintiff) and against the defendant in the amount of $500,000. Plaintiff brought this action under the provisions of the Federal Employers Liability Act, 45 U.S.C. § 51, *et seq.*, to recover damages for personal injuries plaintiff received during the course of his employment with the St. Louis-San Francisco Railway Company. The St. Louis-San Francisco Railway Company merged with Burlington Northern Railroad Company, a subsidiary of Burlington Northern, Inc. Plaintiff initially filed this lawsuit naming St. Louis-San Francisco Railway Company and Burlington Northern Railroad Company, Inc., as defendants. Plaintiff subsequently substituted Burlington Northern Railroad Company as the sole defendant.

On appeal, defendant contends that the trial court erred in: (1) admitting into evidence testimony regarding a green cart constructed by plaintiff's expert; (2) failing to instruct the jury that it was required to reduce to present value any damages it awarded to plaintiff for future loss; (3) failing to instruct the jury to sign the verdict form; (4) overruling defendant's motion for mistrial based upon an alleged emotional display by the plaintiff; and (5) overruling defendant's post-trial motion to receive and record as true the original verdict form received. For the reasons set forth, we affirm the judgment.

The plaintiff was employed as a journeyman electrician for the St. Louis-San Francisco Railway when he injured his lumbar spine on May 23, 1977. On the day of his injury, the plaintiff was manually lifting a propane gas tank onto a receptacle on one of defendant's business cars. He began his employment with the St. Louis-San Francisco Railway in March 1967. In 1971 he was a journeymen electrician and in 1976 he became a lead electrician.

As an electrician, part of the plaintiff's duties included loading propane tanks onto business cars. Business cars are used for meetings, track and bridge inspections, and customer entertainment. They contain an observation room, bedrooms, a dining room, kitchen, etc. Bottled propane is used on the cars for various purposes including cooking. The propane tanks are loaded onto the business cars at a customary "business car spot" and are stored in metal racks near the "business car spot."

The propane tanks are metal, cylindrical in shape and weigh approximately 239–257 pounds when loaded. The business cars hold four propane tanks in receptacles which are located on the exterior underneath each car approximately 25 inches above ground level. The receptacles hold the tanks on their sides with the top of each tank parallel to the railroad ties.

The propane tanks are loaded onto the business cars manually. Loading the tank involves pushing the tank off the metal rack where it is stored on its side and rolling the tank along the chat surface to the business car where it is then laid on its side with the top facing the rail. The bottom of the tank is then lifted, end over end, until the bottom of the tank is perched on the receptacle opening. The top of the tank is raised and is then shoved into the receptacle. On the day of plaintiff's injury, he was loading a propane tank onto a business car in the manner described when he felt a pain in his lower back and an electrical type shock down both of his legs. Plaintiff sustained permanent injuries to his lumbar spine.

After ten days of trial, the jury retired to deliberate on a verdict. The jury returned to the courtroom and gave the clerk an *unsigned* verdict form in favor of defendant which was read by the clerk. Discovering the verdict form was unsigned, the judge informed the jury that he could not accept it and instructed the jury to complete the verdict form in accordance with the instructions of the court. Thereafter, the jury returned a verdict in favor of plaintiff which complied with the court's

instructions and was signed by nine jurors. At this time, defendant moved for a mistrial based on the prejudicial effect of an alleged emotional display by plaintiff in front of the jury when the first verdict was read by the clerk to the court. The trial judge overruled defendant's motion, polled the jury and thereafter discharged the jury.

Defendant contends in the first point that the trial court erred in admitting plaintiff's exhibit No. 10, a green cart, and testimony relating thereto, into evidence because such evidence was irrelevant and immaterial to any issue in the lawsuit and thereby interjected matters into the lawsuit which were highly prejudicial.

This lawsuit was brought by plaintiff on the theory that defendant failed to provide a reasonably safe environment for its employees. Plaintiff provided evidence at trial that the defendant had previously supplied its employees with carts to load propane tanks onto business cars and had abandoned their use in the late 1960s. Additionally, employees of defendant testified that they had made numerous requests that a cart for loading propane tanks be furnished. These requests were made to defendant's foreman during safety meetings. The employees had been assured that a cart would be provided. No cart was provided by defendant to facilitate the loading of propane tanks. An employee of defendant's fabricating shop testified that the cart that had been requested by plaintiff and his fellow employees could have been assembled with the labor, tools, and materials in defendant's fabricating shop which constructed carts for other purposes for use by defendant's employees.

In preparation for trial, plaintiff's experts constructed a cart, plaintiff's exhibit No. 10, viewed by this court during oral argument, which could be used to load propane tanks onto defendant's business cars. Plaintiff's expert, Mario Gomez, an engineer with a doctorate degree, was provided information to build the cart from an electrician and a fabricating shop employee, who were either employed by defendant presently or at some time in the past. Specifically, Dr. Gomez was provided with: sketches of carts once used by defendant's employees to load propane tanks onto business cars; details of the conditions present at the business car location where the cart would be used and the materials available in the defendant's fabricating shop which could be used to construct a cart. Additionally, Dr. Gomez was provided with the size and weight of loaded propane tanks, photographs of the business cars and the receptacles, and the dimensions of the receptacles.

Dr. Gomez, using the aforementioned information, designed a cart which could be used to load propane tanks onto the business cars. The cart was fabricated by Gary Niemczyk under the direction of Dr. Gomez. Niemczyk testified that he constructed the cart in less than 16 hours.

Defendant asserts that any evidence relating to the "green cart" or the use of a cart to load propane tanks onto the business cars is inadmissible. Defendant argues that the cart was not an "available" alternative method of loading propane tanks because it was unknown to the defendant at the time of plaintiff's injury. Additionally, defendant contends that the admission of this evidence interjected a false standard into the lawsuit—whether there were safer tools or methods of work which might have been used. We disagree with defendant's arguments.

In issue is whether the tools or methods of work which were in fact made available to plaintiff were reasonably safe as required by *Williams v. Terminal Railroad Association of St. Louis,* 339 Mo. 594, 98 S.W.2d 651, 656 (1936). In a case involving the issue before us, evidence as to the manner of unloading radiators the previous day was held admissible to show that there was a safer method available. The question of alternative methods are facts to be considered by the jury in determining whether or not the method used by defendant was reasonably safe and whether or not other methods could have been easily adopted. *Clark v. Widmer Engi-*

*neering Co.,* 263 S.W. 500, 501 (Mo.App. 1924).

■ We find that the testimony regarding the defendant's previous use of carts to load propane tanks on business cars, the requests made by employees to foremen to provide carts for the purpose of loading propane tanks and the testimony regarding the capability of defendant's own fabricating shop to construct the requested carts was relevant and probative on the issue of whether defendant was negligent in failing to provide reasonably safe equipment for its employees' use. It cannot be said that the use of a cart to load propane tanks onto business cars was unknown to the defendant at the time of plaintiff's accident because in the past carts had been used by defendant for loading the propane tanks onto business cars.

Finally, with regard to the admission of the green cart into evidence, we find defendant's arguments without merit. The admission of demonstrative evidence is a matter entrusted to the sound discretion of the trial court. *Fravel v. Burlington Northern Railroad,* 671 S.W.2d 339 (Mo. App.1984), *cert. denied,* 469 U.S. 1159, 105 S.Ct. 907, 83 L.Ed.2d 921 (1985). The value of demonstrative evidence lies in the human factor of understanding better what is seen than what is heard. The green cart offered as exhibit No. 10 by the plaintiffs we find relevant to the case. The cart incorporated the design feature of a previous cart used by defendant's employees and the design features requested by defendant's employees at safety meetings.

■ Defendant alleges that the cart interjected a false standard into the lawsuit. Defendant failed to raise this objection at trial and thus failed to preserve this objection for appellate review. *Culver-Stockton College v. Missouri Power and Light Company,* 690 S.W.2d 168, 172 (Mo.App. 1985). The trial court did not abuse its discretion in admitting into evidence the green cart and testimony relating thereto because such evidence was relevant and probative. Defendant's first point is denied.

■ Defendant's second point contends that the trial court committed plain error in failing to instruct the jury that it was required to reduce to present value any damages it awarded to plaintiff for future loss. The instruction that defendant contends the trial court failed to give was neither submitted by the defendant nor was there an objection regarding the court's failure to give a future loss instruction made at the instructional conference or in the motion for new trial filed December 21, 1984. This contention was asserted for the first time in an untimely second motion for new trial filed March 12, 1985, which was overruled by the court. Our review of this issue on appeal is limited to plain error pursuant to Rule 84.13(c).

In support of defendant's position, defendant cites *St. Louis Southern Railway v. Dickerson,* 470 U.S. 409, 105 S.Ct. 1347, 84 L.Ed.2d 303 (1985). *Dickerson* held that Missouri trial courts may no longer refuse to instruct juries on the present value of future damage awards, *supra.* In *Dickerson,* the defendant railroad requested that the trial judge submit to the jury a present value instruction. The trial judge refused to submit the instruction offered by defendant because such an instruction was not provided for in the Missouri Approved Instructions promulgated by the Supreme Court of Missouri for use in FELA cases. *Dickerson* was handed down by the Supreme Court several months after the trial of this case.

During the trial, plaintiff argued that his injuries caused him great pain and that his degenerative condition was progressive in nature. As a result, plaintiff argued that he would incur future expenses for the treatment of his condition. Additionally, plaintiff argued that although he continues to work, the types of jobs he is able to perform is limited as a result of his injuries. Plaintiff argued that he had lost $60,-000 in past wages and that he will most likely continue to lose wages in the future as a result of his injury. At no time during the trial did plaintiff compute the damages

for the plaintiff's future wage loss using a mathematical calculation. Likewise, at no time did defendant argue or present testimony regarding the present value of plaintiff's future wage loss which defendant is allowed to do during the course of trial. *Bair v. St. Louis-San Francisco Railway Co.*, 647 S.W.2d 507, 513 (Mo. banc 1983), *cert. denied*, 464 U.S. 830, 104 S.Ct. 107, 464 U.S. 830 (1983).

The damage instruction submitted by plaintiff and given to the jury was the general damage instruction. MAI 8.02. As said, defendant failed to submit an instruction requiring the jury to reduce to present value any damages it awarded to plaintiff for future loss.

Because the case at bar was tried prior to the *Dickerson* decision, we are confronted with the issue of whether the substantive law enunciated by the Supreme Court in *Dickerson* is to be applied retroactively in the case before us.

In a long line of cases, Missouri courts have held that it was not error for trial courts to refuse to instruct juries on the present worth of future loss. *Dunn v. St. Louis-San Francisco Railway Co.*, 621 S.W.2d 245 (Mo. banc 1981), *cert. denied*, 454 U.S. 1145, 102 S.Ct. 1007, 71 L.Ed.2d 298 (1982); *Bair, supra.* As a result of the *Dickerson* holding, which requires that a judge must give a future loss instruction if requested, we are confronted with the issue of whether this should be applied retroactively to the case before us.

A similar situation occurred several years ago as a result of *Norfolk & Western Ry. Co. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980). Previous to *Liepelt*, Missouri courts had disapproved the use of an instruction directing the jury that their verdict would not be subject to federal or state income taxes and that such taxes should not be considered in fixing the amount of any award. *Senter v. Ferguson*, 486 S.W.2d 644 (Mo.App.1972). The United States Supreme Court held in *Norfolk & Western Ry. Co. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), that it was error to refuse a requested

instruction that the jury should not consider taxes in fixing the amount of a damage award. Thus, *Bair v. St. Louis-San Francisco Ry. Co., supra,* at 512, held that the Liepelt holding requiring the income tax instruction would be applied retroactively in those cases pending on appeal if an instruction on the tax consequences of an award had been prepared and requested at trial. Therefore, the defendant railroad which failed to request an income tax instruction at trial was not excused from their failure by their supposed reliance on prior case law prohibiting the instruction. *Bair* held that a total or partial new trial is not required in every case before *Liepelt* simply because a *Liepelt*-type instruction was requested and not given. Rather, the Missouri Supreme Court held that the trial court should, instead, examine the verdict rendered to determine whether the absence of an instruction affected the verdict and was prejudicial.

In the case before us, there was no instruction or evidence on the reduction of future damages to present value submitted by the defendant. The evidence presented showed that the plaintiff continued to work even though he was limited in the type of jobs he could perform. His condition was degenerative in nature and would require medical treatment in the future. We conclude, after reviewing the record, that this case did not involve the reduction of future wage loss. Plaintiff's counsel did not calculate the plaintiff's future wage loss to the jury because the plaintiff continued to work at his present job. Thus, we do not believe that the *Dickerson* holding should be applied retroactively in the case before us. A new trial, total or partial, is not required in the case before us. Point two is denied.

Defendant contends in his third point that the trial court erred by failing to instruct the jury that the verdict form was incomplete because it was unsigned and by refusing to instruct the jury to sign the verdict. Defendant, therefore, argues that in refusing to instruct the jury to sign the verdict form, the trial court caused the

jurors to believe that their verdict for defendant was unacceptable to the court.

 A well established principle in Missouri is that a jury controls the verdict until it is announced and recorded, and during this time, the jury remains under the direction of the court. *Blackman v. Botsch*, 281 S.W.2d 532, 535 (Mo.App.1955). The court has a duty to examine the jury's verdict to determine if the verdict is defective in any manner. *Supra*, at 535. If the verdict is found to be ambiguous, inconsistent, or otherwise defective, the jury should be given the opportunity to correct the verdict or to find a new one before such verdict is recorded and made a part of the judgment. *Supra*, at 535; *Brown v. Kroger Company*, 358 S.W.2d 429, 435 (Mo. App.1962); *Thorne v. Thorne*, 350 S.W.2d 754, 757 (Mo.1961).

 To constitute a final verdict, the jury decision must be submitted to the court, accepted by it and assented to by the jury, and recorded by the court. *Garland v. National Super Markets, Inc.*, 696 S.W.2d 342, 344 (Mo.App.1985). No verdict exists until the above mentioned procedure has been fulfilled. *State ex rel. Ford Motor Company v. Godfrey*, 505 S.W.2d 59, 61 (Mo. banc 1974); *State ex rel. Vogel v. Campbell*, 505 S.W.2d 54, 56–57 (Mo. banc 1974). The jury, as a consequence of this procedure, is guaranteed ample opportunity to correct any misunderstanding, realize the finality of its decision and finally assent to a verdict. *State ex rel. Vogel v. Campbell, supra*, at 57. Whether the jury's finding is intended to be its final decision is a matter of fact to be determined by the trial court considering the totality of the circumstances. *Delaney v. Gibson*, 639 S.W.2d 601, 603 (Mo. banc 1982).

In the case at bar, the "verdict" was insufficient in that it was not complete because it was not signed by the jurors. MAI 2.04. The trial court did not and could not receive or accept this unsigned verdict form as the verdict. At trial, the clerk read the original unsigned verdict form. The following occurred at the bench between the attorneys and the trial judge after the reading of the incomplete verdict:

THE COURT: I can't accept this. They didn't sign it.

MR. NEWBOLD: I think you have to tell them they need to sign the verdict, Your Honor.

THE COURT: I was just going to poll the jury and then I realized—I frankly was reviewing it and then didn't get down to there.

MR. NEWBOLD: You just have to ask them to sign it, that's all.

THE COURT: I'm going to tell them, "You haven't completed it."

MR. FRIEDMAN: Well, they have to understand that those jurors, if they don't have the nine—

THE COURT: Oh, yeah, but I had told them, "Read it."

MR. FRIEDMAN: I don't believe it. (The following proceedings resumed within the hearing of the jury).

THE COURT: Members of the jury, I cannot accept the verdict at this time. You haven't completed it. I had indicated that you are to be guided by the Instructions, and in those instructions there's an instruction with regard to completing the verdict form. So I would send you upstairs to complete the form.

Madam Sheriff, take charge of the jury. (Thereupon, at 3:50 p.m., the jury again retired to consider its verdict).

The trial judge, in sending the jury back, pointed out to the jury that the "verdict" was incomplete and carefully refrained from making any suggestions which would influence the jury's final determination. Moreover, the trial judge expressly brought to the jury's attention the fact that included in the instructions given to the jury was an instruction which would aid the jury in completing the verdict form. The trial judge, consequently, did precisely what has been outlined as proper procedure under the given circumstances. The court required the jury to retire to reconsider its verdict after the infirmity had been called to the jury's attention. *Burch v. King*, 549

S.W.2d 919, 925 (Mo.App.1977). No impropriety, therefore, can be found resulting from the conduct of the trial court.

■ The return of the unsigned verdict and the refusal of the trial court to accept the verdict demonstrates that the jury never reached a final verdict in this case until after the jury returned a verdict which complied with the court's instructions. The jury verdict is not binding until properly completed in accordance with the instructions and accepted by the court. *Thorne v. Thorne, supra,* at 767. The unsigned verdict form did not constitute a verdict, and so, the trial court did not err or abuse its discretion by instructing the jury to complete the verdict form by following the instructions previously given to the jury by the court. The trial judge properly advised the jury how to complete the verdict without unduly influencing the jury.

After returning to the jury room, the jurors sent a note to the court asking whether its decision was binding since the verdict had been read in open court. Additionally, at that time, the jury requested a new verdict form, but the court did not send a new verdict form to the jury. In response to the jurors' question, the court answered that the jury's verdict could not be accepted because it was not complete. In compliance with the instructions given by the court, the jury returned a verdict for the plaintiff which was signed by nine jurors. This verdict was received and recorded by the trial court. At no time did the court give the impression to the jury that its verdict was unacceptable to the court because the jury found for the wrong party. In the case at bar, the trial court properly instructed the jury to complete the verdict form by complying with the court's given instructions. Point three is denied.

Defendant contends in his fourth point that the trial court erred in refusing to order a mistrial or to grant defendant a new trial after the jury returned a different verdict from the original unsigned verdict. Defendant asserts that a mistrial should have been declared because of an alleged emotional display by plaintiff in the presence of the jury which caused the jurors to have sympathy for plaintiff and to change the original incomplete "verdict."

During the trial at the time when the alleged emotional display occurred, defendant failed to object and to timely request the trial court to take any corrective action. The record fails to support the existence of any emotional display. Only after the jury had rendered its verdict in favor of plaintiff, more than one hour after the alleged emotional display, did defendant first move for a mistrial because of the alleged emotional display. Plaintiff's attorney denied on the record that any emotional display had occurred.

■ Defendant's unsupported statement is the only reference in the record concerning this matter. Defendant's statement is not self-proving and cannot be accepted as a substitute for a record of proof. *Wardenburg v. White,* 518 S.W.2d 152, 155 (Mo.App.1974); *Landers v. Smith,* 379 S.W.2d 884, 887 (Mo.App.1964).

> Proof of the existence of ... any issue in a case cannot be bottomed on extraneous statements made by counsel while voicing an objection anymore than can a case be determined on such statements printed in a brief. If an appellant desires review of an issue it is his duty to furnish a transcript containing all the records, proceedings and evidence relating thereto, and where there is an absence of such items there is nothing for an appellate court to decide. The same applies to a trial court. An appellant cannot be heard to convict a trial court of error upon an issue which died for complete lack of nourishment by way of exhibits, evidence or testimony.

*Edwards v. Hrebec,* 414 S.W.2d 361, 366 (Mo.App.1967). Defendant has consequently failed to preserve its allegation of error for review by this court.

■ Defendant's inaction constituted a waiver of its allegation of error regarding the alleged emotional display. A party who witnesses misconduct and decides to play a game of chance cannot object to the

alleged misconduct if it proves to be against him. *Maxam v. Dillon,* 674 S.W.2d 258, 260 (Mo.App.1984). The Missouri Supreme Court has held that the failure of a defendant to object to the alleged misconduct at the time of the occurrence constitutes a waiver of defendant's right to raise an allegation of error on appeal. *Contestible v. Brookshire,* 355 S.W.2d 36, 43 (Mo. 1962). For the above reasons, we find a waiver occurred as a result of defendant's actions. Point four is denied.

Defendant's last point is that the trial court erred in refusing to grant defendant's motion to receive and record as true the original verdict. Our determination of defendant's third point is dispositive of this contention. The fallacy of defendant's argument is that there is a jury verdict in favor of defendant to receive and record as true. The trial court received and recorded only one verdict, the one properly completed and assented to by the jury. Defendant's fifth point, therefore, is denied.

For the reasons set forth above, we affirm the judgment.

REINHARD and CRIST, JJ., concur.